J. Noah Hagey, Esq. (SBN: 262331)
   hagey@braunhagey.com
Doug Tilley, Esq. (SBN: 265997)
   tilley@braunhagey.com
J. Tobias Rowe, Esq. (SBN: 305596)
   rowe@braunhagey.com
Yekaterina Kushnir, Esq. (SBN: 350843)
   kushnir@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

*Attorneys for Plaintiff*
*Mauricio S. Beugelmans*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| MAURICIO S. BEUGELMANS, a resident of California,<br><br>   Plaintiff,<br><br>  v.<br><br>OKX INC., d/b/a "OKX," f/k/a OKCOIN USA, INC., a Delaware corporation; and LINDA LACEWELL, a resident of California,<br><br>   Defendants. | **VERIFIED COMPLAINT FOR EMERGENCY AND INTERIM RELIEF IN AID OF PENDING JAMS ARBITRATION RE: (1) BREACH OF CONTRACT; (2) VIOLATION OF LANHAM ACT, 15 U.S.C. § 1125(a); (3) TORTIOUS INTERFERENCE WITH CONTRACT; AND (4) DEFAMATION PER SE** |

VERIFIED COMPLAINT

By and for his Complaint against Defendants OKX Inc. ("OKX") and Linda Lacewell ("Lacewell" and, together with OKX, "Defendants"), Plaintiff Mauricio S. Beugelmans ("Plaintiff" or "Mr. Beugelmans") alleges as follows.[1]

**SUMMARY OF CLAIMS**

1.     Plaintiff Mauricio S. Beugelmans, a nearly thirty-year veteran of the financial services industry, reluctantly brings this suit for injunctive and other relief to remedy the ongoing false attacks leveled against him by his former employer, Defendant OKX, and its agents.

2.     Mr. Beugelmans served as in-house legal counsel and then as Chief Legal Officer of OKX, a leading global cryptocurrency exchange, from August 2021 to March 2025.  He successfully led OKX's legal and compliance efforts, both before and after a publicly reported U.S. government investigation into alleged regulatory violations that culminated in a February 2025 plea agreement between OKX and federal prosecutors.

3.     In March 2025, Mr. Beugelmans resigned amid efforts by former New York Governor Andrew Cuomo to exert control and influence over the billion-dollar exchange and its founder, Mingxing "Star" Xu.  Based on public reports, Cuomo insinuated himself with Mr. Xu and, since joining OKX as an advisor in 2023, has expanded his influence and authority within OKX.[2]  Cuomo's former New York Chief of Staff (Defendant Linda Lacewell) was also made a

---

[1] The allegations herein are based on Plaintiff's personal knowledge following a reasonable investigation and, as to matters alleged on information and belief, facts believed to be true based on the information reasonably available.  Plaintiff is cognizant of his former role as OKX's chief in-house counsel and, in an abundance of caution, has taken guidance from experienced ethics counsel and former chair of the State Bar of California Committee on Professional Responsibility and Conduct in connection with the subject matter and allegations set forth herein and his accompanying motion.  Plaintiff likewise has sought to limit his allegations to matters of public record and/or previously disclosed by OKX or its agents in connection with government or third party investigations, including those recited in OKX's February 24, 2025 plea agreement with the U.S. Attorney for the Southern District of New York, Case No. 25-cr-00069-KPF (S.D.N.Y.) (the "Plea Agreement"), attached hereto as **Exhibit E**.  In furtherance of his obligations, Plaintiff also is lodging certain portions of this Complaint under seal that might arguably be considered confidential by OKX, so that proper treatment might be addressed by OKX to the Court.

[2] *See, e.g.*, https://www.bankingdive.com/news/former-ny-governor-andrew-cuomo-lead-joint-blockchain-venture-okx-nyse-owner-ice/823552/ (June 23, 2026 article announcing that "Cuomo will co-chair a joint venture between cryptocurrency firm OKX and New York Stock Exchange parent company Intercontinental Exchange,"); https://www.okx.com/ro/learn/cuomo-board (July 20, 2026 press release announcing Cuomo's appointment to OKX's Board of Directors:  "He began

1

company advisor, also elevated to OKX's Board, and ultimately named Mr. Beugelmans' replacement as Chief Legal Officer.

4. The story should have ended with Mr. Beugelmans' departure from OKX. In April 2025, the parties entered a comprehensive separation agreement, including broad non-disparagement provisions which prohibited any type of disparaging or defamatory speech against the other (the "Separation Agreement"), attached hereto as **Exhibit A**. Mr. Beugelmans moved on. He was in high demand given his long track record in the industry and his success at OKX. He was quickly hired by another global exchange to oversee its global government relations. Later, Mr. Beugelmans started his own business, together with other former OKX legal and technology leaders, offering, among other things, a cryptocurrency platform through which users can transact in certain cryptocurrencies in a manner that complies at every turn with the federal Bank Secrecy Act and other applicable laws.

5. OKX, however, has struggled since Mr. Beugelmans' departure. Public reports show that it has faced a series of management issues and legal attrition and, on information and belief, Cuomo and Lacewell began searching for scapegoats. Thus, nearly a year following the parties' separation, OKX began publicly castigating Mr. Beugelmans and his role at the company in a series of targeted public leaks, interviews, and social media posts. OKX's agents, including Lacewell, falsely attacked Mr. Beugelmans and thereby intentionally violated the parties' Separation Agreement as well as federal and state law.

6. Among other false and defamatory statements, Defendants published widely viewed social media posts implying that Mr. Beugelmans belonged to a class of "unethical and toxic lawyers" who "sell their clients out" rather than "defend [them] within the bounds of the law[;]" "play[] politics and games, manufacturing narratives to justify excessive fees[;]" "exploit clients who don't know better[;]" "cover[] for a lack of real skill and substance" to "mak[e] unethical money[;]" and "when clients start to question them, they shift the blame—fabricating issues to

working with OKX in 2023, advising on our regulatory and institutional strategy in the U.S. 'Governor Cuomo has been a thoughtful voice for OKX for years, and his move to the board formalizes a relationship that has already shaped how we approach the U.S. market….' said Star Xu, Founder and CEO, OKX.").

force exits or justify outrageous compensation." (*See* X "Twitter" post from OKX founder and CEO Mr. Xu (@Star_OKX), attached hereto as **Exhibit B**.)

7.     In addition to his character and ethics, Defendants also attacked Mr. Beugelmans' business acumen and contributions.  During interviews with a legal reporter published just weeks ago, Defendant Lacewell misrepresented that the legal team under Mr. Beugelmans had no "strategic plan to meet the needs of the business[;]" failed to offer any "competitive advantage for the company[;]" and was instead "just sitting up on a mountain handing down decrees of what the legal opinion is" rather than "empowering the business to move forward with responsible models." (*See* June 24, 2026 Law360 article, attached hereto as **Exhibit C**.)  Defendants' agents reposted the Law360 piece to maximize their audience.  (*See* LinkedIn post, attached hereto as **Exhibit D**.)

8.     Defendants further publicly attacked Mr. Beugelmans' ability to competently build out and manage a team.  Lacewell, for example, told Law360 that OKX's legal organization under his leadership had lacked "talent" and needed to be "upgrad[ed]"—including by replacing Mr. Beugelmans with Defendant Lacewell: "If somebody was leaving, we used the opportunity to really upgrade the nature of the talent we got…" (Ex. C.) Defendants similarly denigrated Mr. Beugelmans' teams as poorly organized, "dispersed throughout OKX without centralized groups focused on functions like product, commercial, litigation and investigations[;]" inadequately staffed with "nonlawyers, like paralegals, analysts and operations[;]" and weighed down by "duplication and layering of bureaucracy[.]"  (*Id.*)

9.     Such attacks are only the tip of the iceberg.  Upon information and belief, Defendants have maligned Mr. Beugelmans during industry conferences, in communications with investors and partners, and in countless industry meetings.  The campaign was directed, authorized, and/or ratified by OKX leaders (including Lacewell, Cuomo, and/or Mr. Xu) and designed to maximize the reach and audience receiving the false attacks on Mr. Beugelmans' reputation and business.

10.     These actions knowingly violate the parties' Separation Agreement and constitute unfair competition under federal law.  Mr. Beugelmans' new venture competes directly with OKX for U.S. retail and institutional customers, including by offering a platform through which U.S.-

based users can transact in cryptocurrencies in full compliance with applicable law. Defendants seek to undermine all of this, and unfairly enhance their own competitive standing, by attacking the record, career, and reputation Mr. Beugelmans built over nearly thirty years.

11. The existing and future harm caused by Defendants' actions is undeniable. Mr. Beugelmans' entire professional career has been called into question. He no longer receives outreach from executive recruiters and headhunters. His investor contacts have gone cold. Deals that were promising and ready to execute have been canceled. Industry sources communicate that the issues with OKX need to go away. Further such attacks to Mr. Beugelmans' trade, reputation, and business will only make the situation that much worse and possibility of recovery even more difficult, if not wholly impossible.

12. Mr. Beugelmans remains proud of his work at OKX and of the results he and his global team delivered for the exchange, Mr. Xu, and other OKX executives. He has requested that Defendants cease their attacks. They have refused. Mr. Beugelmans, on the other hand, has scrupulously refrained from disparaging OKX despite Defendants' ongoing campaign to damage his reputation and destroy his livelihood. He brings this action now only because he has no other choice. Defendants' ongoing attacks are devastating his reputation and business and should be enjoined in accordance with the clear terms of the parties' Separation Agreement and applicable law.[3]

## PARTIES

13. Plaintiff Mauricio Beugelmans is an accomplished lawyer and financial services industry veteran. He lives in the San Francisco Bay Area with his wife and two children. He previously held in-house and partner positions at leading institutions including Morgan Stanley and Charles Schwab, and has served as a partner or shareholder at nationally recognized law firms, including Schiff Hardin LLP and Murphy & McGonigle (now Davis Wright Tremaine LLP).

---

[3] This Complaint and associated request for temporary restraining order and preliminary injunction are solely directed to maintain the status quo, prevent further irreparable harm to Plaintiff's business and profession, and preserve the ability of a tribunal to provide effective relief on the merits. The remainder of Plaintiff's claims for damages and other relief, to the extent fully calculable, will be resolved in the companion arbitration filed by Plaintiff before JAMS.

VERIFIED COMPLAINT

14.    Defendant OKX Inc., f/k/a OKCoin USA Inc.,[4] is a corporation organized and existing under the laws of the State of Delaware with its "Headquarters" in "San Francisco, California[.]"[5]  OKX is part of a global family of companies that jointly operate the cryptocurrency exchange known as "OKX."

15.    Upon information and belief, Defendant Linda Lacewell is an individual residing in or around Los Angeles, California, and who regularly travels to and performs work on behalf of OKX in the San Francisco Bay Area.  Lacewell is an agent and representative of Defendant OKX and currently serves as its Chief Legal Officer.  Lacewell formerly served as Andrew Cuomo's chief of staff and in various other political roles in New York, including most recently as Superintendent of New York State's Department of Financial Services ("DFS").  Lacewell resigned from DFS following broad press reports regarding her participation in efforts to (a) attack and disparage women who had reported sexual or other misconduct by Cuomo,[6] as well as (b) underreport the number of COVID-related deaths in nursing homes in New York State by some 50%.[7]

16.    Upon information and belief, Lacewell is, and/or at all relevant times was, employed by, in contractual privity with, providing services to and on behalf of Defendant OKX, and

---

[4] During Plaintiff's tenure, OKX was organized as OKCoin USA Inc.  According to public records, OKCoin renamed itself "OKX Inc." late last year.  The Separation Agreement at issue in this case is binding upon Defendant OKX because it is the same entity as signatory OKCoin USA Inc. ("OKCoin") or, at the very least, its "successor[] and assign[.]" (Ex. A § 3(E) ("[T]his Agreement … shall be binding upon the parties hereto and their respective successors and assigns.").

[5] *See* https://www.linkedin.com/company/okcoin/about/ (OKCoin's LinkedIn page); *see also* https://www.okcoin.com/about.html (OKCoin's website: "Okcoin is a globally licensed exchange with offices in San Francisco…").

[6] https://www.cityandstateny.com/politics/2021/08/how-cuomo-administration-sought-undermine-lindsey-boylan/184367/ (reporting that after learning of a tweet published by an accuser who worked for Cuomo at the time, Lacewell and two others obtained the accuser's personnel file and explored whether unflattering materials therein could be shared with the press "for the purpose of rebutting what [Lacewell] said were [the accuser's] false or misleading statements about how and why [the accuser] left the job.").

[7] https://www.nytimes.com/2021/03/04/nyregion/cuomo-nursing-home-deaths.html?smtyp=cur&smid=tw-nytimes.

5

VERIFIED COMPLAINT

otherwise serving as OKX's agent and representative in engaging in the misconduct detailed herein.

17.    Upon information and belief, Defendant OKX acted through its agents, including Lacewell, Cuomo, Star Xu, and Haider Rafique, in committing the misconduct alleged herein. Upon information and belief, (a) such agents were acting within the scope of authority actually and/or apparently conferred upon them by OKX when engaged in the unlawful acts addressed herein, and/or (b) OKX ratified, approved, and adopted such agents' misconduct.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367. Federal subject matter jurisdiction exists under the Lanham Act, 15 U.S.C. §§ 1051, *et seq*.

19.    Venue is proper in this District because (a) all parties reside in this District and/or regularly conduct business in person here; (b) a substantial part of the events and omissions giving rise to Mr. Beugelmans' claims occurred here; and (c) the injury suffered by Mr. Beugelmans is principally suffered here, including because Mr. Beugelmans lives and works within this District.

20.    This Court is the proper forum for Mr. Beugelmans' request for a preliminary injunction in aid of arbitration against Defendants. *See, e.g.*, *Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010) ("a district court may issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process"). There is no other tribunal capable of entering such relief. Unlike JAMS Comprehensive Arbitration Rules & Procedures, which provide for emergency relief even "prior to the appointment of an Arbitrator" (Rule 2(c)), the applicable JAMS Employment Arbitration Rules do not contain any such mechanism or contemplate or authorize emergency relief. Rather, the Employment Rules contemplate that such relief will be pursued in Court by making clear that "[a]ny recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate." JAMS Emp. Arb. R. 24(e).

VERIFIED COMPLAINT

**FACTS**

I.      **MR. BEUGELMANS' CAREER AND EXPERIENCE**

21.      Mr. Beugelmans lives and works in the San Francisco Bay Area.  He is licensed to practice law in California, New York, and the District of Columbia.

22.      Over the past three decades, Mr. Beugelmans has built a reputation for legal and commercial excellence.  He has advised and advocated for top-tier financial institutions and cryptocurrency firms, with a particular emphasis on securities litigation, regulatory, and compliance matters.

23.      Mr. Beugelmans started his legal career in August 1999, as Corporate Counsel for Charles Schwab in San Francisco.  In October 2002, he moved to Morgan Stanley, where he served as Senior Attorney and Vice President in San Francisco and then as Executive Director in New York.  In 2009, Mr. Beugelmans founded his own law firm, Beugelmans LLP, in New York (with subsequent offices in San Francisco and Chicago). He later joined the partnerships of Schiff Hardin LLP and a firm that is merged into Davis Wright Tremaine LLP.

24.      Over his decorated career, Mr. Beugelmans successfully managed numerous regulatory and litigation matters with U.S and international securities regulators, including the Securities and Exchange Commission ("SEC"), the Commodities and Futures Trading Commission ("CFTC"), and the Financial Industry Regulatory Authority ("FINRA"), among others.

25.      Mr. Beugelmans is Peer Reviewed AV® Preeminent™ by Martindale-Hubbel, a distinction reserved for attorneys who have attained the highest levels of professional skill and ethical standing.

26.      He is a frequent speaker and panelist on securities and cryptocurrency regulation, including before the San Francisco CoinAlts Fund Symposium, iConnections Global Alts, Token2049, the San Francisco Bar Association, and the National Association of Minority and Women Owned Law Firms.  He authored "The Current Environment of U.S. Cryptocurrency Regulation," published in the Westlaw Journal for Bank & Lender Liability.

VERIFIED COMPLAINT

## II.   DEFENDANTS OKX AND LACEWELL

27.   Defendant OKX, formerly known as OKCoin, is a corporation organized and existing under the laws of Delaware with its "Headquarters" in "San Francisco, California[.]"[8] OKX is one of several affiliated entities that jointly operate one of the world's largest cryptocurrency exchanges, measured by trading volume, broadly known as "OKX."  That exchange was founded in 2013 by Mingxing "Star" Xu, a Chinese national residing in Singapore.

28.   The largest global OKX entity is Aux Cayes FinTech Co. Ltd. ("Aux Cayes FinTech"), an OKCoin affiliate, a company organized and existing under the laws of the Seychelles, and the defendant in the DOJ enforcement matter.

29.   Upon information and belief, Defendant OKX is a registered and licensed money transmittal business in United States.  During Mr. Beugelmans' tenure, the term "OKCoin" referred to operations and assets in the United States and Europe, whereas "OKX" referred to the overall international crypto brand.  OKCoin recently rebranded as OKX, eroding any prior geographic distinction between OKCoin and OKX.[9]

## III.   MR. BEUGELMANS JOINS OKX IN 2021

30.   OKX hired Mr. Beugelmans in August 2021 to serve as its General Counsel and manage all U.S. legal operations and strategy, based in OKX's Bay Area headquarters.  Prior to joining OKX, Mr. Beugelmans was engaged in private practice as a shareholder at Murphy & McGonigle PC (now part of Davis Wright Tremaine).

### A.   Mr. Beugelmans Is Quickly Elevated to Global Chief Legal Officer

31.   Mr. Beugelmans' duties originally were focused on U.S. legal issues and compliance.  That soon changed, however, as OKX's leaders immediately recognized Mr. Beugelmans' business and legal acumen.

---

[8] https://www.linkedin.com/company/okcoin/about/ (OKCoin's LinkedIn page); *see also* https://www.okcoin.com/about.html (OKCoin's website: "Okcoin is a globally licensed exchange with offices in San Francisco…").

[9] *See, e.g.*, https://www.linkedin.com/company/okcoin/about/ (OKCoin's LinkedIn page: "Okcoin is now OKX!").

32.    From approximately Q1 2022 to March 2025, Mr. Beugelmans oversaw OKX's global legal and compliance functions.

33.    Mr. Beugelmans was formally named OKX's Global Chief Legal Officer and Head of OKX's Legal and Compliance Division in approximately March 2022.  He held those titles until his ouster in March 2025.

34.    Following Mr. Beugelmans' promotion, OKX took compliance steps that would ultimately be recounted favorably in the Plea Agreement with DOJ.

**B.    Mr. Beugelmans Successfully Manages OKX's Legal and Compliance Functions**

35.    The Plea Agreement recounts that, prior to Mr. Beugelmans' arrival in August 2021, OKX had ██████████████████████████████████████.  (*See generally* Ex. E, ("Plea Agreement").)[10] ███████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

36.    In particular (and limiting the discussion to the publicly available recitation in the Plea Agreement), beginning in 2018—some three years before Mr. Beugelmans' tenure began— OKX █████████████████████████████████████████

███████████████████ (Plea Agmt., ¶ 2.) OKX had █████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████ (*Id*. at Att. A (admitted "Statement of Facts" or "SOF") ¶ 3.) In so doing, "████████████████████████████████████."
(*Id*.)

37.    The Plea Agreement further recounts that for years before Mr. Beugelmans joined, ████████████████████████████████████████████████████

████████ (Plea Agmt. at SOF, ¶¶ 14, 16.) ███████████████████████

█████████████████████████ (Plea Agmt. at SOF, ¶ 14(a)), ███████████

---

[10] Mr. Beugelmans is limiting his description of such events to those already disclosed as part of OKX's public Plea Agreement.

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████ (*Id.* ¶¶ 14(c), 15, 16; *see also id.* ¶¶ 20-23.)

38.    Then Mr. Beugelmans joined OKX.  After his hiring in late 2021 and his elevation in early 2022 to head of the exchange's global legal and compliance functions, OKX "████████ ████████████████████[.]"  (Plea Agmt., ¶ 7(d).)

39.    For example, by "approximately November 2022," OKX had implemented ██████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████.  (Plea Agmt. at SOF, ¶ 11.)

40.    OKX also overhauled its platform to apply its new ████████████████████ ████████████████████████████████  (Plea Agmt. at SOF, ¶ 11.)  During the same time period, OKX moved to no longer █████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████."  (*Id.* ¶ 12.)  ██████████████████████████████ ██████.  (*Id.*)

41.    In addition, under Mr. Beugelmans' leadership, OKX implemented ██████████ ██████████████████████████████████  (Plea Agmt. at SOF, ¶ 13.)

42.    Mr. Beugelmans similarly oversaw by "May 2023" OKX's adoption of ██████ ████████████████████████████████████████ ████████████████████████████."  (Plea Agmt. at SOF, ¶ 13.)

43.    The Plea Agreement further recounts that since 2022—when Mr. Beugelmans was appointed as head of global legal and compliance—OKX ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████ " (Plea

Agmt., ¶ 7(d).)

44.     These measures proved critical.  In February 2023—roughly a year after Mr. Beugelmans began his leadership tenure—OKX received a subpoena from the Office of the U.S. Attorney for the Southern District of New York ("SDNY"), one of the most (if not *the* most) sophisticated, aggressive, and accomplished prosecutors of financial crimes in the world.

45.     OKX and Mr. Xu benefitted from the fact that Mr. Beugelmans' team had already initiated internal changes as described above. One of the factors prosecutors consider in exercising their substantial discretion is whether and to what extent a culpable actor voluntarily took measures to identify and cease unlawful activity. Other market participants, like Binance and its founder Changpeng "CZ" Zhao, entered into plea agreements that did not reflect similar voluntary compliance and received more severe penalties around the same time period.[11]

## IV.     MR. BEUGELMANS SECURES A FAVORABLE SETTLEMENT FOR OKX

46.     Mr. Beugelmans' contributions to protecting and advancing OKX's and Mr. Xu's interests continued throughout the DOJ investigation as Mr. Beugelmans led OKX's response strategically, ethically, and effectively.

47.     At the end of the process, the DOJ found that OKX ████████████████
████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████ (Plea Agmt.,
¶ 7(c).)  This ultimately led to OKX receiving ██████████████████████

---

[11] *See generally* Nov. 21, 2023 Plea Agreement between DOJ and Zhao, available at https://www.justice.gov/criminal/media/1327936/dl?inline.  That agreement, and DOJ's public statements surrounding the same, emphasize Binance's and Zhao's knowledge that they were violating U.S. law and nevertheless proceeded without regret or remorse in pursuit of profits.  (*See, e.g.*, https://www.justice.gov/criminal/case/united-states-v-changpeng-zhao; https://www.justice.gov/criminal/case/united-states-v-binance-holdings-limited-dba-binancecom.)

███████████████, which had the effect of ███████████████████████. (*Id.*; *see also id.* ¶ 20.)

48.    Through Mr. Beugelmans' efforts in these respects and others, OKX and DOJ ultimately agreed to a resolution that was far more favorable to OKX than the plea agreements DOJ reached with other industry actors around the same time period.

49.    OKX agreed to ████████████████████████████████████████████████████████████████████████████████████████. (*See* Plea Agmt., ¶¶ 8, 21.) OKX was permitted to continue to operate within the U.S. and to serve U.S.-based individuals and institutions.  In agreeing to these terms, DOJ acknowledged the substantial compliance measures OKX adopted during Mr. Beugelmans' tenure.

50.    The terms of OKX's plea agreement stood in stark contrast to those imposed upon other crypto companies and operators who entered into plea agreements during the same time period. For example, Binance, another cryptocurrency exchange, ███ pleaded guilty to failing to register as a money transmitting business and related crimes.[12]  Binance was made to pay some $4.3 billion in penalties as well as undertake substantial compliance enhancements.  Binance's founder, Changpeng "CZ" Zhao, was personally charged with crimes, pleaded guilty to them, and served time in federal prison.  CZ was further forced to resign as CEO.

## V.    MR. BEUGELMANS SUCCEEDS IN EXPANDING OKX'S TRADING LICENSES AND OPERATING AUTHORITY DESPITE DOJ'S INVESTIGATION

51.    Mr. Beugelmans could have rested on his achievements, having overseen a successful legal and compliance program and resolved the DOJ investigation.  But he did not.

52.    Instead, Mr. Beugelmans also won for OKX the rights to operate in critical markets abroad, including the European Union, Dubai, Singapore, and Australia.

53.    Mr. Beugelmans and his team ultimately succeeded in obtaining for OKX (a) a full Virtual Asset Service Provider (VASP) License in Dubai in January 2024, authorizing the company to provide regulated virtual asset exchange services, including for retail customers, in that global financial hub; (b) a Major Payment Institution License in Singapore in September 2024, permitting

---

[12] https://www.justice.gov/archives/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.

OKX to provide digital payment token services in another key financial locus; (c) an AUSTRAC Digital Currency Exchange Registration and ASOC Australian Financial Services License in 2024, enabling OKX to provide certain crypto exchange services and support regulated derivatives offerings for eligible wholesale clients in Australia; and (d) a full MiCA Crypto-Asset Service Provider (CASP) License from Malta in January 2025, granting OKX rights to legally offer cryptocurrency services throughout the European Economic Area, a free-trade zone uniting all 27 member states of the European Union as well as several non-member nations.

54.    Mr. Beugelmans' achievements did not go unnoticed.  In approximately April 2024, for example, Mr. Xu promoted him to the second-highest tier within OKX's corporate hierarchy (under only Mr. Xu) in explicit recognition of Mr. Beugelmans' skills, contributions, and future value to OKX.

**VI.    MR. BEUGELMANS IS SIDELINED BY CUOMO**

55.    While Mr. Beugelmans dedicated substantially all his time and attention to managing OKX's successful legal and compliance efforts, less scrupulous actors moved to maximize personal gain.

56.    In 2023, OKX named Andrew Cuomo, the former Governor of New York State, to a paid advisor position, according to public reports. Cuomo had resigned in August 2021 after the New York State Attorney General's Office issued a 168-page report finding that Cuomo had sexually harassed multiple women and engaged in a campaign of pressure and intimidation to silence them.[13] Upon information and belief, Cuomo ingratiated himself to Mr. Xu in the hope of garnering money and influence over a global organization.

57.    Cuomo's courtship of Mr. Xu and OKX has borne fruit.  OKX announced just weeks ago that Cuomo will co-chair a joint venture with Intercontinental Exchange, the parent

---

[13] https://ag.ny.gov/sites/default/files/2021.08.03_nyag_-_investigative_report.pdf.

VERIFIED COMPLAINT

company of the New York Stock Exchange.[14] And last week, OKX published that Cuomo had been appointed to OKX's Board of Directors.[15]

58.     Upon information and belief, after Cuomo became involved with OKX, he and Haider Rafique, then OKX's Chief Marketing Officer, ███████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████. Upon information and belief, Cuomo and Rafique perceived an opportunity ██████████████████████.

59.     Upon information and belief, Cuomo urged Mr. Xu to name his long-time ally and lieutenant, Defendant Linda Lacewell, to a senior role within OKX.

60.     Lacewell had previously served as Cuomo's former Chief of Staff (among other political appointments arranged by Cuomo) and featured prominently in several of his personal and political scandals.  Upon information and belief, Lacewell's official New York State biography on the administration's website claimed she oversaw Cuomo's "ethics and law enforcement matters"[16] prior to his resignation in the wake of the New York Attorney General's conclusion that he had sexually harassed multiple women and pressured them to stay silent.

61.     As reflected in the Attorney General's findings and in separate reporting, Lacewell participated in efforts to silence and discredit Cuomo's accusers rather than to investigate their allegations.

62.     It was reported, for example, that after learning of a tweet published by an accuser who worked for Cuomo at the time, Lacewell immediately asked to see the accuser's personnel file and explored whether unflattering materials therein could be shared with the press "for the purpose

---

[14] https://www.bankingdive.com/news/former-ny-governor-andrew-cuomo-lead-joint-blockchain-venture-okx-nyse-owner-ice/823552/.

[15] https://en.bloomingbit.io/feed/news/116608.

[16] https://www.businessinsider.com/cuomo-aide-allegedly-involved-cover-up-once-taught-ethics-classes-2021-3.

VERIFIED COMPLAINT

of rebutting what [Lacewell] said were [the accuser's] false or misleading statements about how and why [the accuser] left the job."[17]

63.     The media widely reported concerns that Lacewell—who at the time served (upon Cuomo's nomination) as the head of New York State's financial services regulator—was retaliating against women and acting in a partisan manner when she was entrusted by the public to faithfully uphold the law.[18]

64.     Lacewell also led Cuomo's coronavirus task force and was one of three aides accused of editing reports to conceal the number of COVID-related deaths in New York State nursing homes.[19]  The New York Times determined that the Cuomo administration underreported the actual death toll by some 50%.[20]

65.     Lacewell resigned her post as Superintendent of New York State's Financial Services Department in the wake of these reports.

66.     Mr. Beugelmans declined to hire Lacewell to join OKX's legal and compliance teams.

67.     Upon information and belief, Cuomo induced Mr. Xu in 2024 to install Lacewell on a Board of Directors within the OKX organization, as has been publicly reported.

68.     At that time, and as recounted above, Mr. Beugelmans remained critical to OKX's compliance efforts and response to the DOJ investigation.  In February 2024, OKX entered into a Retention Agreement with Mr. Beugelmans to ensure his continued employment for at least "three (3) years."

69.     The Plea Agreement with DOJ was finalized and signed just a year later, in February 2025.

---

[17] https://www.cityandstateny.com/politics/2021/08/how-cuomo-administration-sought-undermine-lindsey-boylan/184367/.

[18] *Id*.

[19] https://www.nytimes.com/2021/03/04/nyregion/cuomo-nursing-home-deaths.html?smtyp=cur&smid=tw-nytimes.

[20] *Id*. ("[A]n edited version prepared by [another aide] did not remove the higher death toll.  That occurred later, after Ms. DeRosa and Ms. Lacewell became aware of its inclusion. It was taken out soon after.").

VERIFIED COMPLAINT

70.     Cuomo, Rafique, Lacewell, and others then accelerated their efforts to drive Mr. Beugelmans out of OKX and gather power, influence, and opportunity for themselves.

71.     In an abundance of caution, and in keeping with personal ethics and professional obligations, Mr. Beugelmans declines to provide specifics in this pleading.  Suffice it to say that Defendants marginalized Mr. Beugelmans and reduced and undermined his authority within OKX.

72.     On or about March 15, 2025, Mr. Beugelmans issued a written "Notice of Good Reason," in which he involuntarily resigned from OKX in view of, among other things, "a reduction in [his] authority, duties and responsibilities[.]"

73.     Mr. Beugelmans' Notice set forth "a list (not intended to be complete nor definitive) of acts and omissions that demonstrate such reduction in [his] authority, duties and responsibilities," as well as other grounds constituting "Good Reason" within the meaning of his February 2024 Retention Agreement.

## VII.    THE PARTIES' SEPARATION AGREEMENT AND DEFENDANTS' NON-DISPARAGEMENT OBLIGATION

74.     Under the terms of his Retention Agreement, Mr. Beugelmans was entitled to substantial compensation upon the termination of his employment.  The parties ultimately negotiated and executed in April 2025 a "Confidential Separation Agreement and General Release." (*See* Ex. A.) Two provisions are of primary relevance to this action.

75.     First, OKX affirmed "that it is not aware of any wrongdoing by [Mr. Beugelmans]." (Separation Agmt., p. 1.) Second, the parties agreed to a broad non-disparagement provision, specifically to protect against the substantial and irreparable harm that might result should one side disparage or denigrate the other.  That provision provides, with emphases added, that:

> To the fullest extent permitted by law … ***the Parties agree not to make, cause, or assist any other person or entity to make, any statement, written or verbal***, to any third party, person, entity, client, potential client, vendor, potential vendor, reporter, author, producer, media outlet, industry group, financial institution or similar person or entity, ***or to any general public media***, including all forms of social media, in any form (including, without limitation, books, articles or writings of any other kind, as well as film, videotape, audio tape, computer/internet format, social media posts or replies, or any other medium), ***which impugns or attacks or is otherwise defamatory or critical of, the reputation, financial condition, business affairs, or character of the other Party***…

16

VERIFIED COMPLAINT

(*Id.*, § 2(G).)

76.     From Mr. Beugelmans' perspective, it was critical to prevent OKX and its personnel (including, without limitation, Lacewell, Cuomo, and Rafique) from disparaging his competency, ethics, character, trustworthiness, and achievements.

77.     An attorney's reputation and credibility are their most valuable assets in seeking future employment and other opportunities; garnering credibility with investors, tribunals, regulators, and other critical audiences; and otherwise pursuing professional goals and providing for themselves and their family.  These considerations are particularly critical to protect when one works in a highly regulated and scrutinized space, such as finance and crypto.

78.     For an attorney and businessperson like Mr. Beugelmans—who operates in a complicated and heavily regulated space and is entrusted with ensuring that entities moving *trillions* of dollars comply with the law—it would be catastrophic for a former client or employer to denigrate that attorney's credibility, competency, effectiveness, and trustworthiness.  For such a person to even be suspected of improprieties, conflicts of interest, self-dealing, or ineffectiveness would lead to professional ruin (including, without limitation, lost job opportunities, inability to secure backing for new ventures, and the like), to say nothing of the associated personal and familial impact.

79.     In many sectors, and especially in spaces like those in which Mr. Beugelmans has long operated, it does not matter if allegations of impropriety are true or not.

80.     Entities who deal with regulators are generally unwilling to employ as their Chief Legal Officer, Chief Compliance Officer, General Counsel, or other similarly senior legal representative any person whom they question will doggedly pursue those entities' interests as required by law and professional ethics.

81.     Investors and financiers evaluating opportunities to invest in crypto and financial services entities (such as Mr. Beugelmans' new entity) similarly decline to provide capital or other support if those entities' leaders have been accused of incompetence, ineffectiveness, self-dealing, or the like.

VERIFIED COMPLAINT

82.    OKX and its personnel (including, without limitation, Rafique, Cuomo, Lacewell, and Mr. Xu) surely know these things.  And, upon information and belief, that is precisely why they have acted against Mr. Beugelmans in the ways they have.

## VIII.    OKX BREACHES THE SEPARATION AGREEMENT AND CAUSES IRREPARABLE REPUTATIONAL AND OTHER HARM TO MR. BEUGELMANS

83.    OKX has struggled since Mr. Beugelmans' departure from the exchange.  Upon information and belief, OKX's growth has been slower than anticipated in the United States and its morale and employee retention problems have worsened.  A number of senior personnel resigned, including from the legal and compliance teams formerly under Mr. Beugelmans.  Upon information and belief, additional OKX personnel who expressed frustration and disapproval of the firm's direction were either terminated or mistreated until forced to resign.

84.    In addition, upon information and belief, banking partners, institutional customers, regulators, and others have raised questions about the facts and circumstances relating to OKX's current compliance mechanisms, particularly in view of attrition among legal and compliance personnel.

85.    Upon information and belief, OKX insiders, including Cuomo, Lacewell, and Rafique, needed to identify a scapegoat for OKX's past and current troubles.  They settled on Mr. Beugelmans and, despite their legal obligations, published damaging allegations about him they know are false.

86.    Over the past weeks and months, Defendant OKX breached its obligations under the parties' Separation Agreement and substantive law through statements issued, approved, ratified, endorsed, and otherwise publicized by its authorized representatives, including as detailed above.

87.    In April 2026, for example, OKX founder Star Xu, apparently believing a false narrative concocted by Rafique and others that Mr. Beugelmans had sought during the DOJ investigation to undermine Mr. Xu and replace him as CEO, castigated Mr. Beugelmans in a viral social media post with over 100,000 views.  (Ex. B.) Mr. Xu claimed that he has experienced "firsthand" the ill-effects of "unethical and toxic lawyers" who "sell their clients out" rather than "defend[ them] within the bounds of the law[,]" "playing politics and games, manufacturing

18
VERIFIED COMPLAINT

narratives to justify excessive fees… and exploit clients who don't know better." Mr. Xu accused such lawyers of "covering for a lack of real skill and substance – and making unethical money[,]" then "when clients start to question them, they shift the blame – fabricating issues to force exits or justify outrageous compensation." Mr. Xu urged others to "cut these toxic people out of your life – even if it comes at a cost – and take the lesson to stay away from them in the future."

88. While Mr. Xu veiled his attacks by not mentioning Mr. Beugelmans by name, his audience understood that they were directed at Mr. Beugelmans. Mr. Xu has publicly spent the last 13 years building OKX and has not been reported to manage any other enterprise in recent years.

89. There is, moreover, an obvious link between Mr. Xu's statements concerning a perceived "lack of real skill and substance" and "selling clients out" with the DOJ investigation as well as the Plea Agreement announced in 2025—especially because OKX insiders falsely claimed to the media that Mr. Beugelmans' departure from the company arose from that settlement. In addition, the assertions in Mr. Xu's post were identical in substance, and often in verbiage, to other false accusations OKX insiders had leveled against Mr. Beugelmans in connection with his exit.

## IX.    OKX REFUSES TO ABIDE BY REQUESTS TO CEASE ITS DISPARAGEMENT

90. On April 17, 2026—days after Mr. Xu's post—Mr. Beugelmans sent OKX a cease-and-desist letter demanding that OKX and its agents immediately end their disparagement and other misconduct. A copy of Mr. Beugelmans' letter is attached hereto as **Exhibit F**.

91. Defendants refused to adhere to their obligations. Instead, Defendants amplified their attacks.

92. Just weeks ago, Lacewell smeared Mr. Beugelmans again, this time in statements to Law360, an influential legal publication with millions of readers. (*See* Ex. C.) As Defendants intended, Law360 published its interview with Lacewell on June 24, 2026.

93. Lacewell's false statements are quoted at length throughout the piece, repeatedly and systematically disparaging Mr. Beugelmans and his tenure as the company's Chief Legal Officer. (*See generally* Ex. C.) Lacewell misrepresents, *inter alia*, that OKX's legal department under Mr. Beugelmans:

a.    Never had any "strategic plan to meet the needs of the business" (in fact, Mr. Beugelmans had such plans and implemented them);

b.    Did not offer any "competitive advantage for the company" (in fact, Mr. Beugelmans and his team obtained trading licenses and secured positive agreements with regulators);

c.    Was "just sitting up on a mountain handing down decrees of what the legal opinion is" rather than "empowering the business to move forward with responsible models" (in fact, Mr. Beugelmans worked closely with business leaders to advance OKX's interests and attain its goals in accordance with the law);

d.    Was poorly organized and "dispersed throughout OKX without centralized groups focused on functions like product, commercial, litigation and investigations" (in fact, Mr. Beugelmans' teams had regional and topical leaders, personnel dedicated to specific functions and business needs, and established orderly chains of command so that teams whose members do not all physically sit together—a fact of any global organization—are still cohesively and centrally organized);

e.    Was inadequately staffed with "nonlawyers, like paralegals, analysts and operations" (in fact, including an appropriate number of junior or non-attorney personnel improves cost, time, and operational efficiency, as not all tasks bearing on legal or compliance functions can nor should be performed by lawyers); and

f.    Was opaque, cumbersome, and inefficient given "duplication and layering of bureaucracy" (in fact, Mr. Beugelmans did not impose any "red tape" or other limitations that prevented business leaders from having their needs promptly met).

94.    Lacewell claimed that OKX's legal organization under Mr. Beugelmans had lacked "talent" and needed to be "upgrad[ed]"—including by replacing Mr. Beugelmans with herself: "If somebody was leaving, we used the opportunity to really upgrade the nature of the talent we got…" (Ex. C.)

95.    In truth, however, OKX's legal and compliance teams were already comprised of top-tier talent, including partners and senior attorneys from prestigious law firms, department heads

VERIFIED COMPLAINT

from successful Silicon Valley companies, lawyers who built critical organizations and operations for other international institutions, and the like. There was thus no need for any "upgrade" in talent, just new leadership's desire to surround itself with familiar faces.

96.    Mr. Beugelmans is referenced throughout Lacewell's false attacks by implication, innuendo, and by common sense. Any common or sophisticated reader with knowledge of OKX's history, or that of Mr. Beugelmans, will have no doubt that her attacks were aimed at him.

97.    It was public knowledge, and was particularly well-known in the crypto space, that Mr. Beugelmans was Lacewell's immediate predecessor as Chief Legal Officer and that he held that role for years, both before and after the DOJ inquiry commenced. Moreover, upon information and belief, Lacewell and Cuomo had each previously disparaged Mr. Beugelmans, including at a recent meeting in Japan attended by over 100 individuals.

98.    Making matters worse, Lacewell and Mr. Xu republished and promoted the Law360 article on their own social media pages. So too did others of OKX's representatives, including OKX's Head of Communications for the Americas.[21]

99.    Upon information and belief, these steps were directed, authorized, and/or ratified by OKX leaders (including Lacewell, Cuomo, and/or Mr. Xu), were intended to maximize how many people saw those false and disparaging statements, and were also aimed at impairing Mr. Beugelmans' ability to compete with OKX through his new venture.

100.    In each instance, Defendants' statements were not only disparaging but intentionally false. This is confirmed by the publicly available facts OKX admitted via the Plea Agreement, including that Mr. Beugelmans oversaw robust and successful legal and compliance operations and resolved the DOJ investigation on terms far more favorable than those imposed upon other crypto industry actors around the same time period.

101.    Mr. Beugelmans' entitlement to relief is further proven by additional facts, documents, and other evidence that Mr. Beugelmans declines to provide in this pleading out of an

---

[21] https://www.linkedin.com/posts/davidheinzinger_law360-took-a-deep-look-at-how-linda-lacewell-share-7476080136271065088-GYQR/?utm_source=share&utm_medium=member_desktop&rcm=ACoAAAD1QZkBXtf5LQygER3bxBrNihbAjEfPtIY.

abundance of caution in view of his professional obligations and ethical constraints, but will adduce in due course and under appropriate judicial supervision when permitted to do so.

## X.    DEFENDANTS' ACTIONS ARE CAUSING GRAVE AND IRREPARABLE HARM TO PLAINTIFF'S REPUTATION, BUSINESS AND TRADE

102.    Defendants' disparagement, defamation, and other breaches have caused irreparable harm to Mr. Beugelmans.  They will continue to do so unless enjoined.

103.    First, by falsely casting him as some combination of incompetent, ineffective, unethical, and self-interested, Defendants have permanently tarnished Mr. Beugelmans' hard-earned professional reputation. *Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907, 976 (N.D. Cal. 2025) ("Injury to reputation 'is not easily measured or fully compensable in damages' so 'often held to be irreparable'").

104.    Second, Defendants' smears have diminished and potentially eliminated Mr. Beugelmans' ability to secure employment of the sort and at the level that he has earned through decades of excellence, in a way that is difficult to quantify or remedy through money alone.  *Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, 781 F. Supp. 3d 920, 941 (N.D. Cal. 2025) (finding irreparable harm because "the false pretense of [inadequate] performance is an injury that will persist for [plaintiff's] working life").

105.    Third, Defendants' breaches have frustrated, jeopardized, and potentially destroyed Mr. Beugelmans' ability to secure investment and other capital for his new venture.  *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019) (affirming preliminary injunction because "[t]he loss of an ongoing business representing many years of effort and the livelihood of its owners, constitutes irreparable harm"), *vacated on non-pertinent grounds*, 141 S. Ct. 2752 (2021). That impacts not only Mr. Beugelmans and his family, but his team and their families—including the former OKXers who joined Mr. Beugelmans' new venture because they know, trust, and respect him.

106.    Upon information and belief, this third category of harm is not a mere unintended consequence of Defendants' personal, political, or retaliatory animus against Mr. Beugelmans but

rather an intentional effort to promote OKX's own products and offerings as well as squelch competition though false claims to the market.

107.    According to market research, less than 20% of the U.S. population is exposed to cryptocurrency, whereas upwards of 60% invest directly or indirectly in traditional securities. There is thus a huge, as-yet-untapped market for crypto platform operators in the U.S.  Whichever becomes the platform of choice for the most users stands to reap substantial economic benefit from transaction and other fees, partnerships, and other lucrative opportunities.  Competition among crypto platform operators thus is both stiff and aggressive.

108.    OKX has direct economic motives to disparage, defame, and attack Mr. Beugelmans, separate and apart from personal or other animus against him.  By falsely advertising, for example, that Mr. Beugelmans was somehow responsible for OKX's publicly reported historical violations, led disorganized and unreliable legal and compliance teams, personally acted in unethical ways, or mishandled the DOJ investigation, OKX communicates that its own products and services are better, more trustworthy, more capable, and more desirable now that Mr. Beugelmans is gone.  Similarly, in advertising those same false claims, Defendants also undercut Mr. Beugelmans' competing crypto platform by undermining one of its core value propositions: end-to-end compliance.

109.    A crypto platform operator's compliance capabilities are highly material to its business prospects.  Individual "retail" users want to know, for example, that they are not buying cryptocurrency from bad actors engaged in drug or human trafficking.  Institutional customers, such as banks, need to know that they are not potentially facilitating transactions with persons subject to sanctions by the U.S. Department of Treasury.

110.    If it appears—even based on demonstrable falsehoods—that a particular crypto platform operator is unable to achieve these and other compliance requirements, retail and institutional customers are highly likely to spurn that platform in favor of a competitor they perceive as more trustworthy.  Defendants know this.

111.    Upon information and belief, Defendants' disparagement, defamation, and other misconduct aimed at Mr. Beugelmans are intended to economically benefit OKX by falsely

communicating to the market that (a) OKX's problems were Mr. Beugelmans' fault; (b) retail and institutional customers can and should trust OKX and adopt its products now that he is gone; and (c) those same customers cannot and should not trust Mr. Beugelmans' new, directly competing venture.

112.    Defendants' unlawful conduct has caused grave irreparable and other harm to Mr. Beugelmans, and will continue to do so unless enjoined.  Mr. Beugelmans will pursue permanent injunctive, monetary, and other relief in arbitration.  In the interim, he needs and is entitled to preliminary injunctive relief in aid of that proceeding to prevent further harm during its pendency and ensure that the Arbitrator is able to accord complete and meaningful relief.

113.    Defendants have demonstrated that they will not respect their obligations voluntarily.  As recounted above, Mr. Beugelmans previously directed cease-and-desist correspondence demanding that they cease their breaches and disparagement.  Defendants refused and amplified their attacks.

114.    It is similarly beyond debate that no arbitral award can undo harm from additional disparaging comments OKX may "make, cause, or assist," or the defamatory claims and false advertising in which Defendants continue to engage, while the arbitration pends.

115.    A Court Order precluding further disparaging statements—in precisely the form that OKX promised in connection with the Separation Agreement—is therefore necessary to protect Mr. Beugelmans as well as ensure that the arbitral process can yield an effectual and meaningful result.

## XI.    MR. BEUGELMANS FILES JAMS ARBITRATION; FILES THIS COMPLAINT FOR INTERIM RELIEF

116.    Contemporaneous with the filing of this action for interim and provisional relief to maintain the status quo, Mr. Beugelmans has filed an arbitration demand before JAMS in accordance with the parties' Agreements.[22]  Mr. Beugelmans will pursue final relief in that forum,

---

[22] As noted, *supra*, the parties' Separation Agreement explicitly contemplates filing "suit" for injunctive relief to redress a violation of that provision of the Separation Agreement. (*See* Ex. A.) Moreover, unlike the standard Comprehensive JAMS Arbitration Rules, the Employment Rules governing the parties' dispute resolution provides no process for appointment of an emergency arbitrator or related emergency interim award or relief to maintain the status quo pending arbitrator

including for recovery of damages associated with Defendants' conduct. In event any Defendant challenges arbitral jurisdiction, Mr. Beugelmans expressly reserves the right to pursue his claims in this Court, or any other court of competent jurisdiction.

## CAUSES OF ACTION

### First Cause of Action

### (Breach of Contract — Against Defendant OKX)

117.    Mr. Beugelmans incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

118.    Mr. Beugelmans and OKX are parties to a valid, enforceable written contract.

119.    Mr. Beugelmans has performed all obligations required of him under the Separation Agreement.

120.    OKX breached the Separation Agreement's Non-Disparagement provision, which provides that the parties agreed not to make any statement, written or verbal, to any third party or to any general public media which impugns or attacks or is otherwise defamatory or critical of, the reputation, financial condition, business affairs, or character of the other Party. (*See* Ex. A, Separation Agreement § 2(G)(i).) OKX breached the non-disparagement provision through statements issued, approved, ratified, endorsed, or otherwise publicized by its authorized representatives, including: (a) Star Xu's April 5, 2026 social media post disparaging Mr. Beugelmans as, among other falsehoods, an "unethical and toxic lawyer[]" who "sell[s] their clients out," "exploit[s] clients who don't know better," and "fabricat[es] issues to force exits"; (b) Linda Lacewell's June 24, 2026 Law360 interview disparaging OKX's legal and compliance functions under her immediate predecessor, Mr. Beugelmans; (c) the republication and promotion of the Law360 article by Lacewell, Mr. Xu, and OKX's Head of Communications for the

---

appointment.  For the same reason, the Employment Rules expressly state that seeking such relief in court is not contrary to (nor violative of) the parties' arbitration agreement or JAMS Rules. JAMS Emp. Arb. R. 24(e) ("Any recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.").

VERIFIED COMPLAINT

Americas; and (d) Lacewell's and Andrew Cuomo's disparagement of Mr. Beugelmans at a company meeting in Japan.

121.    As a direct and proximate result of OKX's breach, Mr. Beugelmans has suffered damages, including damage to his professional reputation, diminished and potentially eliminated employment opportunities, and frustration of his ability to secure investment for his new venture.

**Second Cause of Action**

**(Violation of Lanham Act, 15 U.S.C. § 1125(a)(1)(B) — Against All Defendants)**

122.    Mr. Beugelmans incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

123.    Defendants made false statements of fact regarding the quality, adequacy, and value of (a) OKX's legal, compliance, and regulatory services under Mr. Beugelmans' leadership; (b) the improvement in the quality, adequacy, and value of OKX's operations and offerings since his departure; and (c) the quality, adequacy, and value one might expect if electing to do business with Mr. Beugelmans in the future.  These include, without limitation, Lacewell's statements as reported in her commercial, widely published, and promoted interview with Law360.

124.    While Lacewell and others have in certain instances been careful not to refer to Mr. Beugelmans by name, the relevant audience, or at the least a significant portion thereof, readily understood Defendants' comments to refer to Mr. Beugelmans.  Among other facts, it is public knowledge, and particularly well-known among crypto firms and operators, that Mr. Beugelmans was Lacewell's immediate predecessor and had led OKX's legal and compliance teams for nearly half a decade.  It had, moreover, been falsely reported that Mr. Beugelmans' exit from OKX was related to the DOJ Plea Agreement over OKX's historical violations.  As a whole, any reader (and certainly those knowledgeable about the crypto space) would understand Defendants' false attacks as directed to Mr. Beugelmans.

125.    Defendants' statements were made in commercial advertising or promotion on behalf of OKX, intended to influence commercial decisions by clients, investors, and business partners, and widely disseminated.

VERIFIED COMPLAINT

126. These statements deceived, or had the tendency to deceive, a substantial segment of that audience regarding the characteristics, quality, adequacy, and value of (a) OKX's legal, compliance, and regulatory services under Mr. Beugelmans' leadership; (b) the improvement in the quality, adequacy, and value of OKX's operations and offerings since his departure; and (c) the quality, adequacy, and value one might expect if electing to do business with Mr. Beugelmans in the future.

127. Defendants intended to deceive their audiences in these respects.

128. Defendants' deception is material, in that it is likely to influence commercial decisions by clients, investors, and business partners regarding whose legal, compliance, or advisory services to engage or fund, including decisions bearing on Mr. Beugelmans' venture.

129. Lacewell made her statements to Law360 in her official capacity as OKX's Chief Legal Officer, concerning matters squarely within her professional responsibilities, rendering OKX directly liable for those statements. Independently, OKX's own Head of Communications for the Americas—acting within the scope of his role managing OKX's official corporate communications and social media presence—republished and promoted the Law360 article on LinkedIn, itself a separate act of OKX's own commercial advertising or promotion, distinct from Lacewell's original statements.

130. Upon information and belief, OKX's leadership—including Lacewell, Cuomo, Rafique, and/or Mr. Xu—directed, authorized, and/or ratified the republication and promotion of the Law360 article described above, with the specific intent of maximizing the audience for those statements and impairing Mr. Beugelmans' ability to compete with OKX and raise capital for his venture.

131. Defendants caused these statements to enter interstate commerce through publication by Law360 (a national industry publication) and further dissemination via LinkedIn and other social media by Lacewell, Mr. Xu, and OKX's Head of Communications for the Americas.

132. As a direct and proximate result, Mr. Beugelmans has suffered and is likely to continue to suffer injury to his own commercial, reputational, and other cognizable interests.

VERIFIED COMPLAINT

**Third Cause of Action**

**(Tortious Interference with Contract — Against Defendant Lacewell)**

133. Mr. Beugelmans incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

134. A valid contract existed between Mr. Beugelmans and OKX — the Separation Agreement, including its non-disparagement provision.

135. Upon information and belief, Lacewell knew of the Separation Agreement and its non-disparagement provision, including because she succeeded Mr. Beugelmans as OKX's Chief Legal Officer and, in that role, would reasonably be expected to know of the terms governing her predecessor's departure.

136. Lacewell committed intentional acts designed to induce or disrupt OKX's performance of the non-disparagement provision, or knew disruption was substantially certain to result, by personally making disparaging statements to Law360 and at the Japan meeting, and by, upon information and belief, encouraging, authorizing, or ratifying disparaging statements by Mr. Xu and others that OKX was contractually bound to prevent.

137. OKX's non-disparagement obligation was, in fact, breached and disrupted as a result.

138. Upon information and belief, Lacewell's disparagement of Mr. Beugelmans was not made to advance any legitimate interest of OKX, but to entrench herself in the role she assumed upon his ouster and to retaliate for his prior refusal—despite Cuomo's urging—to hire her.

139. As a direct and proximate result of Lacewell's conduct, Mr. Beugelmans has suffered damages, including the loss of investment opportunities for his new venture and diminished employment prospects.

**Fourth Cause of Action**

**(Defamation *Per Se* — Against Defendants OKX and Lacewell)**

140. Mr. Beugelmans incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

VERIFIED COMPLAINT

141. Defendants published false statements of fact concerning Mr. Beugelmans to third parties, including: (a) Star Xu's April 5, 2026 social media post falsely labeling Mr. Beugelmans as, among other falsehoods, an "unethical and toxic lawyer[]" who "sell[s] their clients out," "exploit[s] clients who don't know better," and "fabricat[es] issues to force exits"; (b) Linda Lacewell's June 24, 2026 Law360 interview disparaging OKX's legal and compliance functions under her immediate predecessor, Mr. Beugelmans; (c) the republication of those statements by Lacewell, Mr. Xu, and OKX's Head of Communications for the Americas; and (d) Lacewell's and Cuomo's statements at the Japan meeting.

142. As explained above, while Lacewell and others have in certain instances been careful not to refer to Mr. Beugelmans by name, the relevant audience, or at the least a significant portion thereof, readily understood Defendants' comments to refer to Mr. Beugelmans. Among other facts, it is public knowledge, and particularly well-known among crypto firms and operators, that Mr. Beugelmans was Lacewell's immediate predecessor and had led OKX's legal and compliance teams for nearly half a decade. It had, moreover, been falsely reported that Mr. Beugelmans' exit from OKX was related to the DOJ Plea Agreement over OKX's historical violations. As a whole, any reader (and certainly those knowledgeable about the crypto space) would understand Defendants' false attacks as directed to Mr. Beugelmans.

143. Each statement is false. As detailed above, Mr. Beugelmans' departure was not related to any deficiency in the DOJ settlement—to the contrary, Mr. Beugelmans' remediation efforts substantially benefited OKX's negotiating position.

144. Each statement is defamatory on its face: each exposes Mr. Beugelmans to hatred, contempt, ridicule, or obloquy, and/or has a tendency to injure him in his occupation as an attorney and compliance executive, without need for extrinsic evidence.

145. Because each statement has a natural tendency to injure Mr. Beugelmans in his profession—as an attorney and compliance executive whose livelihood depends on his reputation for integrity and competence—each is defamatory per se, and Mr. Beugelmans need not separately plead special damages. Mr. Beugelmans has nonetheless suffered actual damages, as detailed above.

VERIFIED COMPLAINT

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for provisional and interim relief against Defendants and each of them, as follows:

A.      For a preliminary injunction enjoining Defendants and their officers, employees, agents, and representatives from directly or indirectly making, causing, or assisting any other person or entity to make any statement, written or verbal, to any third party, person, entity, client, potential client, vendor, potential vendor, reporter, author, producer, media outlet, industry group, financial institution or similar person or entity, or to any general public media, including all forms of social media, in any form, which impugns or attacks or is otherwise defamatory or critical of, the reputation, financial condition, business affairs, or character of Plaintiff Mauricio S. Beugelmans, pursuant to the parties' Confidential Separation Agreement and General Release, dated April 16, 2025;

B.      For further such relief as necessary to ensure Defendants' compliance with the terms of the parties' Separation Agreement and other such assistance as may be required to compel participation in the pending JAMS Arbitration;

C.      For entry of a final order and judgment upon conclusion of the JAMS Arbitration in Plaintiff's favor;

D.      For an award of attorneys' fees and costs as allowed by law;

E.      For costs of suit incurred herein; and

F.      For such other and further relief as the Court deems just and proper.

Dated:  July 28, 2026                                    Respectfully submitted,

                                                                      BRAUNHAGEY & BORDEN LLP


                                                                      By:    _/s/J. Noah Hagey_
                                                                             J. Noah Hagey, Esq.
                                                                             Doug Tilley, Esq.
                                                                             J. Tobias Rowe, Esq.
                                                                             Katie Kushnir, Esq.

                                                                      *Attorneys for Plaintiff Mauricio S. Beugelmans*

30

VERIFIED COMPLAINT

**VERIFICATION**

I, Mauricio S. Beugelmans, declare as follows:

1.    I have read the foregoing VERIFIED COMPLAINT FOR (1) BREACH OF CONTRACT; (2) VIOLATION OF LANHAM ACT, 15 U.S.C. § 1125a; (3) TORTIOUS INTERFERENCE WITH CONTRACT; AND (4) DEFAMATION PER SE in the matter of *Mauricio S. Beugelmans v. OKX Inc., et al*. (the "Verified Complaint").

2.    The averments set forth in the foregoing Verified Complaint are true, based on my own knowledge after a reasonable investigation.  As to those averments alleged upon information and belief, I believe such averments to be true.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:  July 27, 2026                    By:  _____

                                              Mauricio S. Beugelmans

VERIFIED COMPLAINT

Doc ID: 53ac2b82c8daadd5c0bcb142048013e9e2210529